**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

**ESTATE OF DYONTA QUARLES, JR.,**

      *Plaintiff*,

  **v.**                              **Civil No.: 1:22-cv-02037-JRR**

**P.O. J. RICCI,** *et al.*,

      *Defendants*.

---

**MEMORANDUM OPINION**

Plaintiff the Estate of Dyonta Quarles, Jr., through personal representative Mikel Quarles, (the "Estate") filed this action against Defendants P.O. Jonathan Ricci, P.O. John Doe, and P.O. Jane Doe (collectively, "Officer Defendants"), as well as Anne Arundel County, Maryland ("the County"). (ECF No. 1; the "Complaint"). Pending now before the court is Officer Defendant Ricci and the County's (collectively, "Defendants") Motion for Summary Judgment (ECF No. 43; the "Motion"). The court has reviewed all papers; no hearing is necessary. Local Rule 105.6 (D. Md. 2023). For the reasons that follow, by accompanying order, the Motion will be GRANTED.

## I.    BACKGROUND

This action arises from the tragic death of Dyonta Quarles, Jr., a young man fatally shot by Officer Defendant Ricci during a response to an emergency call. The Estate, through personal representative Ms. Mikel Quarles (decedent Mr. Quarles' mother), asserts the following claims:

> <u>Count I</u>: Excessive Force, 42 U.S.C. § 1983, against Officer Defendant Ricci;
> <u>Count II</u>: Failure to Intervene, 42 U.S.C. § 1983, against Officer Defendant John Doe;
> <u>Count III</u>: Wrongful Death, MD. CODE ANN., CTS. & JUD. PROC. § 3-901, *et seq.*, against all Defendants;
> <u>Count IV</u>: Survival Action, MD. CODE ANN., EST. & TRUSTS § 7-401(y), against all Defendants;
> <u>Count V</u>: *Respondeat Superior* against all Defendants;

Count VI: *Monell*[1] Claim, 42 U.S.C. § 1983, against the County; and
Count VII: Indemnification against all Defendants.

(ECF No. 1 at p. 4–12.)  Defendants now seek judgment on all counts against them.  (ECF No. 43.)

## II.   **UNDISPUTED FACTS**

### A.  **First Emergency Call – Evening of January 29, 2022**

At approximately 9:43 p.m., on the evening of January 29, 2022, police officers responded to a 911 call at Ms. Quarles' home in Crofton, Maryland.  (Ex. 1, Computer Aided Dispatch "CAD" Notes, ECF No. 43-1).   Officers Evan Kinsley, Mark Gass, Lemont Johnson, and Candace Markiewicz responded.   *Id.*   Upon their arrival, Ms. Quarles stepped outside to speak with the officers; she relayed the following: Mr. Quarles was acting "crazy" and "erratic;" Ms. Quarles was scared for him because he had said he was "not afraid to die" and that he "want[ed] to go to heaven;" and Mr. Quarles had expressed that he believed his mother (Ms. Quarles) was trying to kill him.  (Ex. 2, Officer Kinsley Body Worn Camera ("Kinsley BWC"), ECF No. 43-3 at 1:45–2:43.)[2]  Ms. Quarles shared with the officers that she believed Mr. Quarles had smoked "weed" through his vape device, and that she had taken him to his doctor for bloodwork to determine if the "weed" had been "laced" with any additional substances.  *Id.*

Upon entering the home, officers ascended the stairs, calling out for Mr. Quarles.  After several moments of the officers not being able to locate him in the home, the officers found Mr. Quarles in a darkened upstairs bedroom closet.  Upon locating Mr. Quarles in the closet, the officers began to speak with him regarding his wellbeing.  *Id.* at 6:30.  Mr. Quarles, who stood six

---

[1] As discussed more fully below, in *Monell v. Department of Social Services*, the Supreme Court explained that "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  436 U.S. 658, 694 (1978).

[2] Unless otherwise specified, the times referenced herein refer to the internal timestamps of the respective recordings.

feet tall and weighed 240 pounds, (Ex. 12, Mikel Quarles Dep. Tr., ECF No. 43-13 at 81:4–7), was agitated and repeatedly asked the officers to leave him alone.  (Kinsley BWC, ECF No. 43-3 at 8:10–9:06.)  Presumably in an effort to determine if Mr. Quarles was oriented to space and time, the officers asked Mr. Quarles what year it was, the name of the President, and his home address, all of which he answered correctly without hesitation.  *Id.* at 9:23–9:44.  The officers then stepped out of the bedroom and again engaged Ms. Quarles, explaining that they did not have authority to transport Mr. Quarles to the hospital, essentially because he appeared to be of sound mind and was not "suicidal."[3]  *Id.* at 10:00–13:45.  The officers discussed other legal options with her, but Ms. Quarles made clear that she just wanted to help her son access mental health treatment.  *Id.*  The officers discussed the mobile crisis team, as well as the option to call for police again if his behavior escalated or he became dangerous.  *Id.* at 17:24–19:29.

### B.  Second Emergency Call – Early Morning January 30, 2022

A little more than six hours later – at around  4:05 a.m. (January 30, 2022), Ms. Quarles again called 911, asking for police because Mr. Quarles was "holding [her] hostage" in her bedroom.  (Ex. 5, 911 Call, ECF No. 43-6 at 0:01–0:30.)  She reported that Mr. Quarles would not allow her to leave her room and that he would push her down on to the bed when she tried to pass him to leave the room.  *Id.* at 0:30–0:45.  Ms. Quarles told the dispatch operator repeatedly that because she was unable to exit the room, the responding officers (Officer Defendants) would need to break down the front door to reach her.  *Id.* at 2:14–2:47, 7:31–9:50.  Ms. Quarles also repeatedly informed the operator that there were no weapons in the home and that Mr. Quarles was not armed. *Id.* at 0:55–1:05, 13:29–13:40.

---

[3] The court acknowledges that the officers' conclusion would appear to be rather at odds with Ms. Quarles' statement mere moments ago that the entire reason she called the police was because her son had said he wanted to go to heaven, was not afraid to die, and was acting erratically, all of which frightened her – and that he needed help.

While it is undisputed that Ms. Quarles discussed her concerns about her son's mental health with the 911 operator, as well as with the officers who responded to her call the previous night, *see* ECF No. 43-6, all that was communicated to Officer Defendants was that the evening shift officers had "handled a [10-96] complaint last evening, with no report."[4]  (Ex. 7, Police Radio Tr., ECF No. 43-8 at 9–11.)  Officer Defendants were also told that Mr. Quarles was not allowing his mother to leave the room, that Mr. Quarles had repeatedly pushed his mother on the bed when she attempted to leave, and that Ms. Quarles wanted Officer Defendants to breach the doors in order to enter the home and reach her.  *Id.* at 14–46.  None of the officers who responded to the January 29 call responded to the January 30 call.  (Ex. 4, Officer Def. Ricci Dep. Tr. ("Ricci Dep."), ECF No. 43-5 at 27:3–6.)

Officer Defendants broke down the door to the home and proceeded up the stairs to the third floor, where Ms. Quarles was being held, all the while loudly announcing, "County Police." (Ex. 9, Officer Def. Ricci Body Worn Camera ("Ricci BWC"), ECF No. 43-10 8:22–8:33.)  As Officer Defendants approached the room where Mr. Quarles was holding his mother hostage, she was yelling, "Help, I'm in here," while crying.  *Id.* at 9:00–9:11; 911 Call, ECF No. 43-6 at 14:33–15:00.  Ms. Quarles called out to Officer Defendants and confirmed on their inquiry that Mr. Quarles was not armed.  (Ricci BWC, ECF No. 43-10 at 9:00–9:15.)  Officer Defendant Ricci then kicked in the bedroom door and entered the room with his gun drawn.   *Id.* at 9:15–9:25.  Mr. Quarles was sitting on the edge of the bed with his arms raised.  *Id.*  Officer Defendant Ricci ordered Mr. Quarles to the ground; Mr. Quarles momentarily complied, before jumping back up on to the bed as his mother screamed.  *Id.* at 9:25–9:31.  Officer Defendant Ricci immediately

---

[4] The term "10-96" refers to a complaint that someone is in a mental health crisis.  (ECF No. 43-1 at p. 3.)

backed out of the room while Officer Benjamin Steffes[5] entered, with his Taser raised, ordering Mr. Quarles again to get on the ground or he was "gonna get tased." *Id.* at 9:31–9:39.

With his Taser drawn and raised, Officer Steffes directed Ms. Quarles to exit the room. *Id.* As she did so, Mr. Quarles chased after her, running after her into the hallway, punching Officer Defendant Ricci in the face and head, and tackling Officer Defendant Ricci to the ground. *Id.* at 9:38–9:50. Officer Steffes shot the Taser at Mr. Quarles, but it appeared to have no effect on Mr. Quarles, who continued to beat Officer Defendant Ricci. (Ex. 8, Officer Steffes Body Worn Camera ("Steffes BWC"), ECF No. 43-9 at 9:35–9:44.) Officer Steffes then tackled Mr. Quarles, which allowed Officer Defendant Ricci to escape from under him. *Id.* at 9:40–10:00; Ricci BWC, ECF No. 43-10 at 9:43–9:50. While Officer Steffes attempted to restrain him, Mr. Quarles punched Officer Steffes in the head. Steffes BWC, ECF No. 43-9 at 9:40–10:00; Ex. 11, Officer Steffes Dep. Tr. ("Steffes Dep."), ECF No. 43-12 at 48:7–11. Officer Steffes had Mr. Quarles pinned on his back, arms above his head, on the floor of the doorway (between the hall and bedroom); Officer Steffes was restraining his arms while sitting on top of Mr. Quarles' torso; Officer Anastasia O'Neale sat atop Mr. Quarles legs. (Ricci BWC, ECF No. 43-10 at 9:55–10:15; Steffes BWC, ECF No. 43-9 at 9:40–11:10; Ex. 10, Officer O'Neale Body Worn Camera ("O'Neale BWC"), ECF No. 43-11 at 2:38–3:35.) Officer O'Neale placed her Taser against Mr. Quarles' leg and told him that he was "gonna get tased." (O'Neale BWC, ECF No. 43-11 at 2:38–2:50.)

For a brief period of time, Mr. Quarles stopped resisting. (Steffes BWC, ECF No. 43-9 at 10:00–11:10.) Officer Defendant Ricci then stepped around Mr. Quarles to enter the bedroom to

---

[5] While it is apparent that Officer Benjamin Steffes and Officer Anastasia O'Neale are Officer Defendants John and Jane Doe, respectively, the Estate never named either as a party, so the court will therefore not refer to them individually as "Officer Defendants."

gain access to Mr. Quarles' arms.  (Ricci BWC, ECF No. 43-10 at 11:10–11:20.)  Officer Steffes asked Mr. Quarles if he was going to cooperate.  (Steffes BWC, ECF No. 43-9 at 10:41.)  Officer Defendant Ricci then attempted to handcuff Mr. Quarles, at which point Mr. Quarles again began physically resisting.  *Id.* at 11:19–11:39; Ricci BWC, ECF No. 41-10 at 11:23.  As the struggle ensued, Officer Defendant Ricci cried out, "ah, stop biting!" and "he's biting my fucking finger off!"  (Ricci BWC, ECF No. 43-10 at 11:31–11:38.)  Officer Steffes attempted to physically restrain Mr. Quarles during the struggle, but Mr. Quarles maintained his hold on Officer Defendant Ricci's hand/fingers.  *Id.* at 11:31–11:44; O'Neale BWC, ECF No. 43-11 at 4:10–4:18. Officer O'Neale deployed her Taser on Mr. Quarles, but he did not stop struggling or biting – it appeared to be of no effect.  (Ricci BWC, ECF No. 43-10 at 11:35; O'Neale BWC, ECF No. 43-11 at 4:11–4:18.)  Officer Defendant Ricci then began shouting, "shoot him, shoot him, shoot the motherfucker, shoot him."  (Ricci BWC, ECF No. 43-10 at 11:37–12:00.)  Officer O'Neale unholstered and drew her firearm, and exclaimed (to Officer Defendant Ricci, Officer Steffes, or both), "move, I can't . . ." (indicating that she was not able to take aim).[6]  (O'Neale BWC, ECF No. 43-11 at 4:18–4:22.)  Officer Steffes was still on top of Mr. Quarles at this time, using his arms to restrain him to no avail.  (O'Neale BWC, ECF No. 43-11 at 4:10–4:18.)  While Mr. Quarles continued to bite down on Officer Defendant Ricci's fingers on his right hand, Officer Defendant Ricci unholstered his firearm with his left (and dominant) hand and shot Mr. Quarles three times in the chest.  (Ricci BWC, ECF No. 43-10 at 11:44–11:48; Steffes BWC, ECF No. 43-9 at 11:40–11:50.)[7]

---

[6] Officer O'Neale later told another officer that she "just didn't have aim" at Mr. Quarles.  (O'Neale BWC, ECF No. 43-11 at 14:45–15:10.)

[7] Defendants also assert that Mr. Quarles "was reaching towards Officer Ricci's firearm during the struggle," but offer no record citation to support that proposition, nor is it visible to the court's eye on the body worn camera footage. (ECF No. 43-1 at p. 8, 19; ECF No. 49 at p. 9.)  The court excludes this assertion and does not consider it an undisputed fact.  FED. R. CIV. P. 56.

Mr. Quarles did not stop biting Officer Defendant Ricci until after the third shot; footage from Officer Steffes' body worn camera shows Officer Defendant Ricci removing his fingers from Mr. Quarles' mouth after the third shot. (Steffes BWC, ECF No. 43-9 at 11:40–11:50; Ricci Dep., ECF No. 43-5 at 69:11–70:25.) After freeing his hand from Mr. Quarles' mouth, Officer Defendant Ricci fell back onto the floor, shouting out in pain, while Officer O'Neale inquired of Officer Steffes, "Is he still going? What does he need? Shoot him again." (Ricci BWC, ECF No. 43-10 at 11:48–12:35; O'Neale BWC, ECF No. 43-11 at 4:24–4:39). Officer O'Neale (who was in the hallway) then told Officer Defendant Ricci (who was in the bedroom) to come to her (presumably for aid); Office Defendant Ricci then stood up and stepped over/around Mr. Quarles' body, before falling to the floor in the hallway. (Ricci BWC, ECF No. 43-10 at 12:00–12:55.) He stated that Mr. Quarles had tried to "bite [his] finger off" and that he could not feel his face. *Id.* at 13:00–13:08. (*See* Ricci Dep., ECF No. 43-5 at 113:2–8, Officer Defendant Ricci testimony that he believed Mr. Quarles was going to bite off his fingers, causing "[serious] bodily harm or potentially death from bleeding out.") While Officer Defendant Ricci lay collapsed in the hallway, Officer Steffes continued to restrain Mr. Quarles (who was still breathing), before ultimately placing him in handcuffs. (Steffes BWC, ECF No. 43-9 at 12:00–12:57.) Two other officers (who had since arrived on scene) assisted Officer Defendant Ricci, carrying him down the stairs while he was mostly nonresponsive, seemingly going in and out of consciousness. (Ricci BWC, ECF No. 43-10 at 14:13–16:19.)

Officer Defendants Steffes and O'Neale then began to tend to Mr. Quarles. (Steffes BWC, ECF No. 43-9 at 14:10.) They removed his handcuffs and started cardiopulmonary resuscitation

("CPR").  *Id.* at 12:17.  The County Fire Department then arrived and, after checking his vitals with a machine, concluded that Mr. Quarles had succumbed to his injuries.[8]  *Id.* at 20:48–25:05.

### C.  Officer Defendant Ricci's Injuries

After the incident, Officer Defendant Ricci was taken to Maryland Shock Trauma in Baltimore, Maryland.  (Ricci Dep., ECF No. 43-5 at 72:18–25.)  Officer Defendant Ricci testified to the following injuries following the encounter: traumatic brain injury; injuries to his eye, nose, hand, and knee; tendon damage; post-concussive injuries; headaches; eye fluttering; permanent hand scarring; and permanent reduced range of motion in his hand.  *Id.* at 72:13–16; 77:2–20; 111:7–112:10.  Officer Defendant Ricci further testified that he was sedated and intubated while at Maryland Shock Trauma to aid his breathing and eating.  *Id.* at 72:18–25; 103:9– 16.  (*See also* un-objected to photos from Officer Defendant Ricci's hospitalization at Ex. 14 ("Ricci Photos"), ECF No. 43-15 at p. 7–8.)

## III.  <u>LEGAL STANDARD</u>

In their Motion, Defendants seek both dismissal of this action against Officer Defendants John and Jane Doe ("Doe Officer Defendants") for failure to prosecute pursuant to Federal Rule of Civil Procedure 41(b), and summary judgment for Officer Defendant Ricci and the County pursuant to Federal Rule of Civil Procedure 56.  They move, in the alternative, for summary judgment for Doe Officer Defendants.

### A.  Federal Rule of Civil Procedure 41(b)

---

[8] In support of their Motion, Defendants attach a report of their expert, Sergeant William Gleason.  (ECF No. 43-16.) The court declines to consider the expert report at this stage.  *See Savage v. Fed. Home Loan Mortg. Corp.*, No. CV JKB-19-2482, 2021 WL 5330345, at *7 (D. Md. Nov. 16, 2021) ("[C]ourts in this District continue to decline to consider unsworn expert reports at the summary judgment stage." (citing cases)).

Federal Rule of Civil Procedure 41(b) provides: "If the plaintiff fails to prosecute or to comply with [the Federal Rules of Civil Procedure] or a court order, a defendant may move to dismiss the action or any claim against it." FED. R. CIV. P. 41(b); *see* Local Rule 103.8 (D. Md. 2023),  "[A] court has the 'inherent power' to dismiss an action for want of prosecution," power that it "derives from 'the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Attkisson v. Holder*, 925 F.3d 606, 625 (4th Cir. 2019), *as amended* (June 10, 2019) (citing *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)).

## B.  Federal Rule of Civil Procedure 56

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  *Id*. at 249.  Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).  A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences."  *Shin v. Shalala,* 166 F.

Supp. 2d 373, 375 (D. Md. 2001) (citations omitted); *see Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023) (providing that "plaintiffs need to present more than their own unsupported speculation and conclusory allegations to survive").

In undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). The court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Adin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the fact-finder to resolve factual disputes, including issues of witness credibility. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).

## IV.   <u>ANALYSIS</u>

In addition to seeking dismissal of Doe Officer Defendants, Defendants' primary argument is that they are entitled to judgment because, based on the undisputed facts, the Estate cannot demonstrate that Officer Defendant Ricci violated Mr. Quarles' constitutional rights as a matter of law. (ECF No. 43-1 at p. 13–14.) The Estate opposes the Motion on the theory that whether Officer Defendant Ricci violated Mr. Quarles' rights should be left to a jury, and that it would be a "miscarriage of justice" to grant summary judgment for Defendants, given that this case concerns "the difficult and complex issue at the heart of this nation's policing—the authority to utilize deadly force." (ECF No. 48 at p. 4–5.)

### A.  Dismissal of Doe Officer Defendants

The court turns first to Defendants' argument that Doe Officer Defendants should be dismissed pursuant to Rule 41(b) for the Estate's failure to prosecute. (ECF No. 43-1 at p. 23–24.) The Estate did not respond to this argument, effectively conceding this point. (ECF No. 48.) *See Stenlund v. Marriott Int'l, Inc.*, 172 F.Supp.3d 874, 887 (D.Md. 2016) ("In failing to respond to [defendant's] argument, Plaintiff concedes the point."); *Ferdinand-Davenport v. Children's Guild*, 742 F.Supp.2d 772, 777 (D. Md. 2010) (explaining that a plaintiff "abandon[s]" her claim where she failed to respond to argument).

As explained *supra*, under Rule 41(b), the court may dismiss an action for want of prosecution. In "recognizing the severity of dismissal as a sanction," the Fourth Circuit has identified four criteria (though not a rigid test) that "guide a district court's discretion in dismissing a case under Rule 41(b)." *Attkisson v. Holder*, 925 F.3d 606, 625 (4th Cir. 2019), *as amended* (June 10, 2019). The criteria include: "(1) the plaintiff's degree of personal responsibility; (2) the amount of prejudice caused the defendant; (3) the presence of a drawn out history of deliberately proceeding in a dilatory fashion; and (4) the effectiveness of sanctions less drastic than dismissal." *Id.* (quoting *Hillig v. C.I.R.*, 916 F.2d 171, 174 (4th Cir. 1990)). Ultimately, "the propriety of an involuntary dismissal ultimately depends on 'the facts of each case.'" *Id.* (quoting *Reizakis v. Loy*, 490 F.2d 1132, 1135 (4th Cir. 1974)). The court considers the four criteria here notwithstanding the Estate's concession of this aspect of the Motion by virtue of its failure to respond to same.

First, as to the Estate's responsibility, this litigation was instituted on August 15, 2022, and had an amendment deadline of June 6, 2023. (ECF No. 32.) Defendants contend that the Estate identified Doe Officer Defendants by name in their initial disclosures on February 17, 2023. (ECF No. 43-1 at p. 23). Over two years have passed since initiation of this action, and more than one year has passed since the deadline for amendment. Defendants now move for dismissal, and, as

said, the Estate does not oppose the Motion on that basis.  Accordingly, considering the Estate's repeated choices not to prosecute this case, the first factor weighs in favor of dismissal.

Second, as to the amount of prejudice this has caused Doe Officer Defendants, it is significant—they have never been named or served in this action against them, nor have they been able to participate in this action that has now reached the summary judgment stage. This factor, therefore, also weighs in favor of dismissal.

Regarding the third factor, while there has been no allegation of deliberate dilatory behavior by the Estate, the court notes that the Estate was on notice of the deadline to amend its pleading (and did not do so by naming Doe Officer Defendants) and has conceded this point due to a failure to respond.  That notwithstanding, in view of the absence of any direct evidence or affirmative indication of deliberate dilatory behavior, the court does not weigh this factor in favor of dismissal.

Finally, considering the fourth factor, the court sees no more effective (and less drastic) sanction than dismissal of the action against Doe Officer Defendants, where, at this late stage of litigation, and after Rule 41(b) argument has been asserted, the Estate continues to decline to prosecute its case against Doe Officer Defendants whose identities are plainly known to the Estate. The requirements of joining and serving parties are not mere niceties, but rather critical steps of the litigation process.  The court therefore weighs this factor in favor of dismissal.

In view of the foregoing, the court concludes that dismissal of this action as against Doe Officer Defendants is warranted under Rule 41(b), especially where the Estate has failed to respond to Defendants' Motion on this basis.  *See Stenlund* and *Ferdinand-Davenport, supra.*  The court is ever "mindful that sound public policy favors deciding cases on their merits and therefore that the power to dismiss must be exercised 'with restraint.'"  *See Sorto v. AutoZone, Inc.*, 821 F. App'x

188, 194 (4th Cir. 2020).  However, as years have passed since the initiation of this action and the Estate knowingly continues not to prosecute its case against Officer Defendants John and Jane Doe, in the face of substantive argument, the court finds dismissal is warranted.  Accordingly, the Motion will be granted to the extent it seeks dismissal of this action as against Officer Doe Defendants.

### B.  42 U.S.C. § 1983 Claims

Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983.  "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred,'" including, relevant here, the Fourth Amendment.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan,* 443 U.S. 137, 144, n.3 (1979)).  To state a claim under section 1983, the Estate "must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted).

#### 1.  *Count I: Excessive Force Claim against Officer Defendant Ricci*

The Estate's claim of excessive force is grounded in the Fourth Amendment.  *Graham v. Connor*, 490 U.S. 386, 388 (1989) (holding that "a free citizen's claim that law enforcement

officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' of his person," is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard"). The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. "The Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable." *Brooks v. City of Winston-Salem, N.C.*, 85 F.3d 178, 183 (4th Cir. 1996). Accordingly, claims of excessive force are "analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham*, 490 U.S. at 395.

On the reasonableness standard, the Fourth Circuit has explained:

> "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish,* 441 U.S. 520, 559 (1979). But the Court has counseled that the test "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Smith v. Ray,* 781 F.3d 95, 101 (4th Cir. 2015) (quoting *Graham,* 490 U.S. at 396).

*Est. of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 899 (4th Cir. 2016); *see Graham*, 490 U.S. at 396 ("Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."). Three factors guide the court's balancing: (1) "the severity of the crime at issue"; (2) "whether the suspect poses an immediate threat to the safety of the officers or others"; and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

14

Courts "assess the objective reasonableness of an officer's use of deadly force 'based on the totality of the circumstances,' 'and based on the information available to the [officer] immediately prior to and at the very moment [he] fired the fatal shots.'"  *Aleman v. City of Charlotte*, 80 F.4th 264, 285 (4th Cir. 2023), *cert. denied,* 144 S. Ct. 1032 (2024) (quoting *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 582 (4th Cir. 2017). "[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

"Because deadly force is extraordinarily intrusive, it takes a lot for it to be reasonable." *Williams v. Strickland*, 917 F.3d 763, 769 (4th Cir. 2019). Specifically, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Further, "a 'significant threat of death or serious physical injury' to an officer does not justify the use of deadly force unless the threat is 'immediate.'" *Williams*, 917 F.3d at 769 (quoting *Garner*, 471 U.S. at 3, 11). And, importantly, "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005)

Turning to the *Graham* factors, the first factor, severity of the crime, favors Defendants. It is undisputed that Officer Defendants were responding to an emergency call that Mr. Quarles was

holding his mother "hostage" and had been pushing her down onto the bed when she tried to leave; Officer Defendants also observed Mr. Quarles preventing his mother from leaving the room.  (911 Call, ECF No. 43-6 at 0:01–0:45; Ricci BWC, ECF No. 43-10 8:22–9:15.)  These facts point toward Mr. Quarles committing at least one misdemeanor in the Officer Defendants' presence. *See Street v. State*, 307 Md. 262, 265–66 (1986) ("This Court has defined false imprisonment as the unlawful detention of a person against his will.  It is a common-law offense in Maryland, the penalty for which is not statutorily prescribed.  At common law, false imprisonment was classified as a misdemeanor."  (citations omitted)).  It is further undisputed that, upon Officer Defendants' arrival, Mr. Quarles failed to comply with verbal commands,[9] chased his mother out of the room, tackled Officer Defendant Ricci to the ground, repeatedly punched Officer Defendant Ricci in the face and head, punched Officer Steffes in the head, and, ultimately, bit Officer Defendant Ricci's fingers.  (Ricci BWC, ECF No. 43-10.)  Again, these facts point toward Mr. Quarles committing additional misdemeanors and/or felonies in the Officer Defendants' presence.  MD. CODE ANN., CRIM. LAW § 3-203(c)(2), (3).  Having observed this conduct (and been subject to it), Officer Defendants were authorized to arrest Mr. Quarles without a warrant as "a person who commit[ed] or attempt[ed] to commit a felony or misdemeanor in the presence or within the view of the police officer."  MD. CODE ANN., CRIM. PROC. § 2-202.

While a suspect committing a misdemeanor may "temper" a finding of the first factor for the officer, this factor more strongly favors the officer where an offense "can be considered violent."  *Lewis v. Caraballo*, 98 F.4th 521, 532 (4th Cir. 2024) (citing is *E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 180 (4th Cir. 2018)).  Officer Defendants observed Mr. Quarles not

---

[9] Although Mr. Quarles momentarily complied with officer direction to get on the floor and place his hands above his head, as set forth above, the evidence is undisputed (and visually confirmed by BWC footage) that he quickly became noncompliant.

allowing his mother to leave the room as she cried out to them for help, and Ms. Quarles reported that Mr. Quarles repeatedly pushed her onto the bed when she tried to leave, and that he would not "let [her] pass."   Further, Mr. Quarles committed multiple violent offenses against Officer Defendants after chasing his mother out of the room.

The second *Graham* factor, whether Mr. Quarles posed an immediate threat to the safety of the officers or others, also favors Defendants.  "In excessive force cases where an officer uses deadly force, the second *Graham* factor is particularly important."  *Franklin v. City of Charlotte*, 64 F.4th 519, 531 (4th Cir. 2023) (quoting *Hensley*, 876 F.3d at 582).  The precise question is "whether a reasonable officer on the scene would have had 'probable cause to believe that the suspect pose[d] a threat of serious physical harm, either to the officer or to others . . . based on the information available to the [officer] immediately prior to and at the very moment [he] fired the fatal shots."  *Aleman*, 80 F.4th at 285.

Here, the undisputed facts demonstrate that Mr. Quarles was actively and aggressively biting down on Officer Defendant Ricci's fingers to the point that he shouted that Mr. Quarles was going to bite off his finger or fingers.  (Ricci BWC, ECF No. 43-10 at 11:35; O'Neale BWC, ECF No. 43-1 at 4:11–4:18; Steffes BWC, ECF No. 43-9 at 11:40–11:50.)  Officer Defendant Ricci could not remove himself from the situation, and Mr. Quarles failed to heed repeated commands to stop, or to yield to lesser force despite repeated, prolonged efforts of Officer Defendants.  *See* Ricci BWC, O'Neale BWC, and Steffes BWC, *supra*.  The court concludes that Officer Defendant Ricci's belief that Mr. Quarles posed an immediate threat of serious physical harm—biting off his fingers—was reasonable under the circumstances, including, importantly, the repeated failed attempts to stop the biting prior to the use of deadly force.

The Estate's arguments that Officer Defendants' actions seemingly contributed to creating a situation in which Mr. Quarles posed the threat to their safety are unavailing.  (ECF No. 48 at p. 6–13.)  First, contrary to the Estate's assertion that Officer Defendants, and specifically Officer Defendant Ricci, "had knowledge that [Mr. Quarles] was suffering a severe mental health crisis prior to arriving on scene," *see* ECF No. 48 at p. 3, it is undisputed that the only information that Officer Defendants had as to Mr. Quarles' mental state was that there had been a 10-96 complaint the prior evening "with no report."[10]  (Police Radio Tr., ECF No.  43-8 at 9–11.)  The other information provided to Officer Defendants was that Mr. Quarles would not allow his mother to leave the room, that he had pushed her onto the bed when she tried to leave the room, and that Ms. Quarles wanted Officer Defendants to breach the front door in order to render her assistance.  *Id.* at 8–51.

Similarly contrary to the Estate's assertion, Officer Defendants did attempt other methods to avoid escalation to deadly force.  While it is true that Officer Defendant Ricci entered Ms. Quarles' room with his firearm drawn (after hearing her cry out for help), it is undisputed (as shown on BWC footage) that Officer Defendant Ricci immediately backed out of the room when Mr. Quarles failed to comply with his verbal commands, and Officer Steffes stepped in with his Taser drawn, making a verbal threat to use the Taser if Mr. Quarles did not comply.  (Ricci BWC, ECF No. 43-10 at 9:25–9:50.)  It is further undisputed that only when Mr. Quarles chased his mother into the hallway (contrary to repeated officer commands), and violently attacked Officer

---

[10] The Estate further asserts that Officer Defendants "knew [Mr. Quarles] was having a psychiatric episode."  (ECF No. 48 at p. 7.)  This is unsupported by any record citation and would appear to be pure speculation, despite undisputed record evidence to the contrary showing that Officer Defendants' knowledge on this point was limited to the fact that there had been an earlier 10-96 call with "no report."  (Police Radio Tr., ECF No. 43-8 at 9–11.)  *See Shin,* 166 F. Supp. 2d at 375, *supra*.  Even to the extent that Officer Defendants had access to the CAD Notes from the prior call, which no party has asserted, at best, that would put them on notice only as to Ms. Quarles' belief that her son had smoked something that she believed to be laced, that he was erratic, and that he was "more of a disorderly subject." (CAD Notes, ECF No. 43-2 at p. 3.)

Defendant Ricci, did Officer Steffes deploy the Taser.  (Steffes BWC, ECF No. at 9:35–9:44.) There is no dispute of fact that following the ineffective Taser deployment, Officer Steffes pushed Mr. Quarles away from Officer Defendant Ricci, until he was able to physically restrain Mr. Quarles from atop his person.  *Id.* at 9:40–10:00.  The facts are further undisputed that during a brief non-resistance respite, Officer Defendant Ricci attempted to handcuff Mr. Quarles, whereupon Mr. Quarles again became physically resistant – ultimately biting down on Officer Defendant Ricci's fingers.  (Steffes BWC, ECF No. 43-9 at 11:19–11:39; Ricci BWC, ECF No. 43-10 at 11:31–11:38.)

Despite all of this, Officer Defendants' initial responses did not include deadly force. Instead, Officer Defendant Ricci verbally commanded him to stop.  (Ricci BWC, ECF No. 43-10 at 11:31–11:38.)  It was ineffective.  Officer Steffes continued his attempts to physically restrain him.  *Id.* at 11:31–11:44; O'Neale BWC, ECF No. 43-11 at 4:10–4:18.  They were ineffective. Officer O'Neale then deployed her Taser.  (O'Neale BWC, ECF No. 43-1 at 4:11–4:18.)  It was ineffective.   There is no dispute of fact that only after all such efforts, upon determining that he was unable to decrease the risk to his safety by removing himself from proximity to Mr. Quarles, did Officer Defendant Ricci shoot Mr. Quarles as he bit down on his fingers.[11]  (Steffes BWC, ECF No. 43-9 at 11:40–11:45.)  Further, the (un-objected to) photos of Officer Defendant Ricci's hand corroborate unchallenged testimony that the injury to his hand was significant.  (*See* Ricci Photos, ECF No. 43-15 at p. 4–6.)

---

[11] The Estate avers that Officer Defendants' actions violated the County's Use of Force Policy, but by its own admission, the Policy plainly states that "Non-force or de-escalation measure[s] are not required when the use of such measures would jeopardize safety."  (ECF No. 48 at p. 3.)  It is undisputed Mr. Quarles posed a safety threat from almost the first seconds of the encounter and that Officer Defendants used multiple means of non-lethal force during the incident prior to resorting to deadly force, in accordance with the Policy, including verbal commands, Tasers, and physical restraint.

In summary, the undisputed facts are that, upon entering the home, Officer Defendants observed (and were targets of) Mr. Quarles' erratic and violent conduct, including chasing after his mother following her calls for officer help, tackling and repeatedly punching Officer Defendant Ricci, punching Officer Steffes, resisting arrest, and biting Officer Defendant Ricci's fingers,[12] which events occurred following Officer Defendants' unavailing efforts to secure Mr. Quarles' compliance with verbal commands and non-lethal force.

The reasonableness of Officer Defendants Ricci's use of force is determined based on what occurred immediately prior to and at the moment the force was employed.  *Aleman*, 80 F.4th at 285, *supra*.  Mr. Quarles' behavior immediately prior to the use of deadly force posed a threat of serious physical harm (at least) to Officer Defendant Ricci from which he was unable to escape; neither verbal commands, physical restraint, nor a Taser proved effective.  These undisputed facts demonstrate the severity of the threat that Mr. Quarles posed to Officer Defendant Ricci in that moment.

Finally, the third *Graham* factor, whether Mr. Quarles was actively resisting arrest, again favors Defendants.  Based on Mr. Quarles' undisputed actions in their presence, Officer Defendants possessed authority to effectuate a warrantless arrest of Mr. Quarles.  MD. CODE ANN., CRIM. PROC. § 2-202.  It is undisputed that Mr. Quarles physically fought Officer Defendants and persistently bit down on Officer Defendant Ricci's fingers when they attempted to handcuff him.

---

[12] It is undisputed that Mr. Quarles did not bite and release; he bit down for a prolonged period during which time Officer Defendant Ricci cried out in pain and told Mr. Quarles to "stop biting."  Further, the use of deadly force followed Officer Defendant Ricci's loud plea for his co-officers to "shoot him" because "he's biting my fucking finger off!"  (Ricci BWC, ECF No. 43-10 at 11:31–11:38.)  It stands to reason that Mr. Quarles was able to hear Officer Defendant Ricci's cries of pain and repeated requests that the other Officer Defendants shoot him in order to get Mr. Quarles to stop (as Mr. Quarles was apparently able to hear the Officer Defendants' initial command that he get on the floor). To the extent Mr. Quarles was able to hear Officer Defendant Ricci, Mr. Quarles would have been effectively verbally advised that if he did not release Officer Defendant Ricci's hand from his mouth, he may be shot. To be clear, the court does not reach such a conclusion, as whether Mr. Quarles could, or did, hear Officer Defendant Ricci during the struggle is not an undisputed fact before the court.

(Steffes BWC, ECF No. 43-9 at 11:19–11:39.)  It is also undisputed that Mr. Quarles attempted to evade Officer Steffes and ignored Officer Defendants' commands when he chased after his mother and physically attacked Officer Defendant Ricci.  (Ricci BWC, ECF No. 43-10 at 9:25–9:50; Steffes BWC, ECF No. at 9:35–10:00.)  Based on the undisputed facts, it is plain that Mr. Quarles actively resisted and sought to evade arrest in the precise moment at which lethal force was deployed, as well as in the moments immediately prior thereto.

All *Graham* factors weigh in Defendants' favor.  In view of the totality of the circumstances as presented by the undisputed facts set forth above, the court concludes that a reasonable officer on the scene would have judged that Officer Defendant Ricci's use of force was reasonable; and considering the applicable legal standard, no reasonable factfinder could conclude that Officer Defendant Ricci's actions were objectively unreasonable and, as such, violative of Mr. Quarles' Fourth Amendment right.  *See Graham*, 490 U.S. at 387, *supra*.

i.    *Prosper v. Martin,* 989 F.3d 1242 (11th Cir. 2021)

As Defendants suggest, the court's conclusion is bolstered by the Eleventh Circuit's decision in *Prosper v. Martin*, a case bearing an unusual factual likeness to the one at bar.  989 F.3d 1242 (11th Cir. 2021).  In *Prosper*, an officer shot the deceased three times in the chest after he bit down on the officer's index finger.  *Id.* at 1246.  In affirming the district court's grant of summary judgment on the basis that the officer's use of deadly force did not violate the deceased's Fourth Amendment right, the Eleventh Circuit discussed the following facts, similarly present here: the officer had observed the deceased acting erratically; the deceased was unresponsive when the officer attempted to engage him; the deceased repeatedly failed to obey the officer's commands; the deceased struck the officer; and the officer's Taser failed to subdue the deceased. *Id.* at 1253–54.

The Eleventh Circuit noted that the forgoing facts "inform[ed] the way a reasonable officer would have assessed the danger posed to his person, as well as the defense necessary to mitigate that danger, in the critical moments before [the officer] fired the deadly shots into [the deceased's] chest." *Id.* The court concluded that, in that "'tense, uncertain, and rapidly evolving' situation, it was reasonable for [the officer] to believe that [the deceased] posed an imminent threat of serious physical harm to his person and that deadly force . . . was necessary to prevent that harm." *Id.* at 1254 (quoting *Graham*, 490 U.S. at 396–97). As discussed in the foregoing pages, as in *Prosper*, "it was reasonable for" Officer Defendant Ricci to believe that Mr. Quarles "posed an imminent threat of serious physical harm to his person and that deadly force . . . was necessary to prevent that harm." *See id.*

The Estate challenges the court's consideration of *Prosper* because it is not controlling authority. True, *Prosper* is not controlling, but it is persuasive, especially given the factual similarities and application of the same federal standard applicable here. In any event, this court reaches its conclusion regardless of *Prosper.* The Estate further asserts that, unlike in *Prosper*, here "there are three officers involved with different testimonies in addition to Decedent's mother, who witnessed a portion of the events." (ECF No. 48 at p. 9–10.) The Estate offers no record factual support for its apparent assertion that testimony of the three Officer Defendants differed materially in ways pertinent to the court's legal analysis here (or in any way required by applicable law). *See Robinson*, 70 F.4th at 780, *supra* (explaining that "plaintiffs need to present more than their own unsupported speculation and conclusory allegations to survive" on summary judgment).

Further, the Estate has failed to generate a genuine dispute of material fact as to any feature of the *Graham* factors and related legal analysis.[13]

Finally, the Estate asserts that, unlike the office in *Prosper,* the Officer Defendants here exacerbated the situation.  This is not compelling for the reasons discussed above – the Officer Defendants entered the home with little information, responded to Ms. Quarles' request that they breach the door to come to her aid and her cries for help, and attempted to restrain Mr. Quarles with multiple lesser means of force prior to resorting to deadly force.  (Ricci BWC, ECF No. 43-10; Steffes BWC, ECF No. 43-9; O'Neale BWC, ECF No. 43-11).  Suggestion that different officer response and actions could have rendered a positive outcome vis-à-vis Mr. Quarles' behavior is entirely speculative and simply is not the applicable legal standard.[14]  "[P]olice officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S. at 397.  *Cf. Franklin v. City of Charlotte*, 64 F.4th 519, 539 (4th Cir. 2023) ("It is not lost on us that we issue this decision from the calm of a courthouse.  In making our decision, we have had the opportunity to replay the unfortunate events of that March 2019 morning.  Unlike us, Officer Kerl could not press pause or rewind before determining whether Franklin posed an imminent threat.").  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision

---

[13] In *Prosper,* all that was presented was a "blurry surveillance video from a nearby business." *Prosper*, 989 F.3d at 1246.  Here, the court has the benefit of (mostly clear) BWC footage of all Officer Defendants.  The Estate raises no dispute of material fact regarding what the BWC footage depicts or its authenticity.

[14] The court acknowledges the Estate's efforts to convey that Officer Defendants' actions to "kick in the bedroom door" and "brandish a gun in [Mr. Quarles'] face," did not deescalate the situation.  (ECF No. 48 at p. 3.)  While the court appreciates the tragic outcome in this case, this point is not well-taken given that Ms. Quarles called 911 for officer aid and intervention, asked that law enforcement break down the doors to get to her and free her from what she described to 911 as a "hostage" situation.  (911 Call, ECF No. 43-6.)

of hindsight." *Id.* at 396.  Again, the undisputed facts demonstrate here that a reasonable officer

on the scene would have judged Officer Defendants' use of deadly force to be reasonable.[15]

### 2.  *Count VI: Monell Claim against the County*

Defendants further argue that, because the Estate cannot demonstrate an underlying

constitutional violation, judgment should be entered for the County as to the Estate's *Monell* claim.

(ECF No. 43-1 at p. 27–28.)

In *Monell v. Department of Social Services*, the Supreme Court concluded that Congress

intended "municipalities and other local government units to be included among those persons to

whom § 1983 applies."  436 U.S. 658, 690 (1978).  The Court further explained that "[l]ocal

governing bodies [] can be sued directly under § 1983 for monetary, declaratory, or injunctive

relief, where . . . the action that is alleged to be unconstitutional implements or executes a policy

statement, ordinance, regulation, or decision officially adopted and promulgated by that body's

officers."  *Id.*

In asserting a *Monell* claim, a plaintiff must "adequately plead . . . the existence of an

official policy or custom that is fairly attributable to the municipality and that proximately caused

the deprivation of their rights."  *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

Such claims consist of two components: "(1) the municipality had an unconstitutional policy or

custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's

constitutional rights."  *Burley v. Balt. Police Dep't*, 422 F. Supp. 3d 986, 1015 (D. Md. 2019)

---

[15] Officer Defendant Ricci also contends that, even if the court concludes that his use of force was objectively unreasonable, he is shielded from liability by the doctrine of qualified immunity.  (ECF No. 43-1 at p. 21.)  "When presented with a section 1983 claim to which qualified immunity has been asserted as a defense, a court must first determine whether the plaintiff has alleged the deprivation of a constitutional right.  Only if a constitutional claim has been alleged should we proceed to the determination of whether qualified immunity shields the defendant from liability." *Young v. City of Mount Ranier*, 238 F.3d 567, 574 (4th Cir. 2001), *abrogation on other grounds recognized by Short v. Hartman*, 87 F.4th 593, 609 (4th Cir. 2023); *see Est. of Green v. City of Annapolis*, 696 F. Supp. 3d 130, 160 n.8 (D. Md. 2023) (same).  Because the court concludes that Officer Defendant Ricci's actions were not objectively unreasonable as a matter of law, the court does not address application of qualified immunity.

(citing *Bd. of Comm'rs of Bryan Cnty., v. Brown*, 520 U.S. 397, 403 (1997)).  A policy or custom that purports to give rise to liability will "not, however, 'be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees.'"  *Id.* (quoting *Milligan v. City of Newport News*, 743 F.2d 227, 230 (4th Cir. 1984)).  The municipality's conduct must demonstrate "'deliberate indifference' to the rights of its inhabitants."  *Id.* (quoting *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997)).  Municipal liability attaches only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  *Monell*, 436 U.S. at 694.  All *Monell* claims require a plaintiff prove three elements: (1) identification of a specific "policy or "custom"; (2) attribution of the policy, and fault for its creation, to the municipality; and (3) an "affirmative link" between an identified policy or custom and a specific rights violation.  *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987).

"It is axiomatic that a *Monell* claim cannot lie 'where there is no underlying constitutional violation by the employee.'"  *Johnson v. Baltimore Police Dep't*, 500 F. Supp. 3d 454, 459 (D. Md. 2020) (quoting *Young v. City of Mt. Rainier*, 238 F.3d 567, 579 (4th Cir. 2001), *abrogation on other grounds recognized by Short v. Hartman*, 87 F.4th 593, 609 (4th Cir. 2023)).  While there are narrow circumstances where "a finding of no *liability* on the part of the individual municipal actors can co-exist with a finding of liability on the part of the municipality," such as where an officer is entitled to qualified immunity, a plaintiff must still successfully demonstrate an underlying constitutional violation to prevail on a *Monell* claim.  *Int'l Ground Transp. v. Mayor And City Council Of Ocean City, MD*, 475 F.3d 214, 219 (4th Cir. 2007) (emphasis added) ("[B]ecause municipalities are not entitled to assert a qualified immunity defense, a finding of a constitutional violation is conclusive as to their liability.").

As this court previously explained in *Estate of Green v. City of Annapolis*:

> Fourth Circuit "law is quite clear . . . that a section 1983 failure-to-train claim cannot be maintained against a governmental employer in a case where there is no underlying constitutional violation by the employee." *Young v. City of Mt. Rainier*, 238 F.3d 567, 579 (4th Cir. 2001) (concluding that because there is no alleged "constitutional violation on the part of any law enforcement officer, the district court properly dismissed the failure-to-train claims asserted against the governmental employers"); *Grayson v. Peed*, 195 F.3d 692, 697 (4th Cir. 1999) (finding that the claims against the county fail because "there are no underlying constitutional violations by any individual" and therefore, "there can be no municipal liability"); *Temkin v. Frederick County Comm'rs*, 945 F.2d 716, 724 (4th Cir. 1991) (holding that "[a] claim of inadequate training under section 1983 cannot be made out against a supervisory authority absent a finding of a constitutional violation on the part of the person being supervised"); *Belcher v. Oliver*, 898 F. 2d 32, 36 (4th Cir. 1990) (explaining that "[b]ecause it is clear that there was no constitutional violation we need not reach the question of whether a municipal policy was responsible for the officers' actions")[;] *Estate of Billups v. Baker*, No. 5:22-CV-206-FL, 2023 WL 2333886 at *3, 2023 U.S. Dist. LEXIS 35133 at *9 (E.D.N.C. Mar. 2, 2023) (concluding that plaintiff failed to state a failure to train or supervise claim "[w]here there is no underlying constitutional violation alleged"); *see also Roach v. Fredericktown*, 882 F.2d 294, 298 (8th Cir. 1989) (finding no inadequate training claim absent a constitutional violation because "in order for municipal liability to attach in a situation such as this, there must first be an underlying violation of the plaintiff's constitutional rights by a municipal employee (for whose actions the City is, presumably, to be held accountable)").
>
> Therefore, absent a viable constitutional claim against the Doe and/or Officer Defendants, Plaintiffs cannot state a *Monell* claim. *See Young*, 238 F.3d at 580 (concluding that the alleged conduct of the individual defendants "does not amount to a constitutional violation" and "the absence of any viable constitutional claim against the individual defendants prevent[s] the claims from being asserted against the governmental employers").

*Est. of Green v. City of Annapolis*, 696 F. Supp. 3d 130, 161–62 (D. Md. 2023).  Accordingly, because the court concludes that Officer Defendant Ricci's use of force did not violate Mr. Quarles' constitutional rights as a matter of law, the Motion will be granted as to Count VI.

### C.  Maryland Law Claims

Given a finding of no underlying constitutional violation, Defendants further seek judgment as to the Estate's state law claims, Count III for wrongful death and the survival action set forth in Count IV.  (ECF No. 43-1 at p. 22–23.)

#### 1.  *Count III: Wrongful Death Claim against Defendants*

The Estate's wrongful death claim is brought under Maryland's Wrongful Death Act, MD. CODE ANN., CTS. & JUD. PROC. § 3-904.  Maryland's Wrongful Death Act "allows the decedent's beneficiaries or relatives to recover damages for loss of support or other benefits that would have been provided, had the decedent not died as a result of another's" wrongful act as defined by the statute.  *Spangler v. McQuitty*, 449 Md. 33, 54 (2016).  "To plead a wrongful death claim under Maryland law, a plaintiff must allege: (1) the victim's death; (2) that the victim's death was proximately caused by the negligence [or other 'wrongful act'] of the defendant; (3) that the victim's death resulted in injury to the plaintiff, who falls within the category of beneficiaries defined by the statute; and (4) that the claim is brought within the applicable statutory period." *Willey v. Bd. of Educ.*, 557 F. Supp. 3d 645, 670 (D. Md. 2021).  Maryland's Wrongful Death Act defines "wrongful act" as "an act, neglect, or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued."  MD. CODE ANN., CTS. & JUD. PROC § 3-902.

Because the court concludes that Officer Defendant Ricci's use of force was objectively reasonable, and the purported use of excessive force was the wrongful act upon which the Estate's claim is based, the Motion will be granted as to Count III.[16]

### 2. *Count IV: Survival Action against Defendants*

The Estate's survival action is based on MD. CODE ANN., EST. & TRUSTS § 7-401(y), which provides: "A personal representative may prosecute, defend, or submit to arbitration actions, claims, or proceedings in any appropriate jurisdiction for the protection or benefit of the estate, including the commencement of a personal action which the decedent might have commenced or prosecuted." "In a survival action, the personal representative of the victim may sue to recover, for the estate of the victim, damages for the economic and non-economic losses suffered by the victim prior to his or her death—the damages that the victim would have been able to recover had he or she survived." *Willey v. Bd. of Educ.*, 557 F. Supp. 3d 645, 670 (D. Md. 2021).

"In contrast to a wrongful death action, the survival statute creates no independent cause of action." *Est. of Green v. City of Annapolis*, 696 F. Supp. 3d 130, 176 (D. Md. 2023) (citation omitted); *see Johnson v. Baltimore Police Dep't*, No. CV SAG-18-2375, 2021 WL 1610152, at *5 (D. Md. Apr. 23, 2021) ("[T]his Court agrees with the view expressed by other judges on this Court that a separate 'survival' claim is improper, because the survival statute creates no independent cause of action."); *Minor v. Prince George's Cnty., Maryland*, No. PWG-15-983, 2017 WL 633321, at *1 (D. Md. Feb. 15, 2017) (dismissing plaintiff's "Survival Act" claim under MD. CODE ANN., EST. & TR. § 7-401(y) because it did not "provide[ ] a separate and distinct cause of action"); *Mang v. City of Greenbelt, Md.*, No. CIV.A. DKC 11-1891, 2012 WL 115454, at *8

---

[16] In addition, Defendants correctly assert that judgment is proper because the Estate is not the proper party to bring a wrongful death action, unlike had this action had been brought by Ms. Quarles individually, as Mr. Quarles' mother. *See Mummert v. Alizadeh*, 435 Md. 207, 219 (2013) (noting that the purpose of Maryland's Wrongful Death Act "was to compensate the families of the decedents, as opposed to the estates of the decedents").

(D. Md. Jan. 13, 2012) ("[C]ourts often use the term 'survival action' loosely to refer to any claim brought by a decedent's estate, to be precise a 'survival action' is merely the *mechanism* by which an estate brings a claim that the decedent could have asserted had he survived.  It is not a 'claim' in the sense that, for example, one might assert a battery or negligence claim." (emphasis in original)).

Here, the court similarly notes that the Maryland survival act relied upon does not create an independent cause of action.  Even if it did, however, judgment for Defendants would still be warranted because the substantive claim upon which the survival action is based—the wrongful death claim—also fails.  (ECF No. 1 ¶ 62.)  Accordingly, the Motion will be granted as to Count IV.

### D.  Counts V and VII: *Respondeat Superior* and Indemnification Claims

Finally, Defendants seek judgment as to Counts V and VII in the event the court concludes there was no underlying constitutional violation.  (ECF No. 43-1 at p. 26–27.)  As an initial matter, the court is dubious as to whether Count V (which sets forth a theory of liability) and Count VII (which sets forth a means of compensation for damages) may stand alone as separate causes of action.  *See, e.g., Seiberlich v. Deossa*, No. CV TDC-23-0560, 2024 WL 343298, at *5 (D. Md. Jan. 30, 2024) ("Judges in this District have held that *respondeat superior* is not a separate cause of action under Maryland law.'" (citing cases)); *Griffin v. Salisbury Police Dep't*, No. CV RDB-20-2511, 2020 WL 6135148, at *7 (D. Md. Oct. 19, 2020) (explaining that, while the Maryland Local Government Tort Claims Act makes a county liable for judgments against its employees "for damages resulting from tortious acts or omissions committed by the employee within the scope of employment," "there is no such cause of action as "indemnification").  (It is also unclear

how Officer Defendant Ricci could be liable under the doctrine of *respondeat superior* or pursuant to a duty of indemnification.)

Regardless, notwithstanding these deficits, because Defendants are entitled to judgment against them on the Estate's substantive claims, no basis for *respondeat superior* liability or indemnification exists.  The Motion will therefore be granted as to Counts V and VII.[17]

## V.    **CONCLUSION**

A profound tragedy occurred here.  Of that, there is no doubt.  For the reasons set forth herein, by separate order, the Motion will be granted.[18]

August 30, 2024                                                /s/_____

                                                                                    Julie R. Rubin
                                                                                    United States District Judge

---

[17] The court does not construe the Estate's Count V to seek *respondeat superior* liability as to the § 1983 claims.  (ECF No. 1 ¶ 68.)  To the extent it does, the claim fails as a matter of law because "[m]unicipalities are not liable under *respondeat superior* principles for all constitutional violations of their employees simply because of the employment relationship."  *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987) (citing *Monell*, 436 U.S. at 692–94).

[18] Defendants object to the Estate's attached newspaper articles as inadmissible, requesting that they be stricken.  The challenged exhibit was not probative to the court's ruling on the Motion and therefore it need not address Defendants' request.